STATE OF CONNECTICUT *v.* STEPHEN C.
MCCULLOUGH
(AC 24832)

Foti, Dranginis and McDonald, Js.

Argued December 6, 2004—officially released March 15, 2005

*Glenn W. Falk*, special public defender, with whom, on the brief, was *Alexandra Block*, law student intern, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Jessica C. Torres*, assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Stephen C. McCullough, appeals from the judgment of conviction, following a jury trial, of operating a motor vehicle while under the influence of intoxicating liquor in violation of General Statutes § 14-227a (a) (1). The defendant claims that the court improperly denied his motion to suppress any evidence obtained as a result of his arrest. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found that, during the early morning of June 9, 2000, the defendant operated a motor vehicle on public roads in Coventry and that, at the

time of such operation, he was under the influence of intoxicating liquor.

The following procedural history underlies the defendant's claim. Prior to the start of trial, the defendant filed a motion to suppress "evidence and statements" obtained as a result of his arrest on June 9, 2000. The defendant generally claimed that his arrest was illegal because the arresting officer lacked the authority to arrest him, as he did, outside of the officer's jurisdiction. During the course of the trial, the court heard argument outside of the presence of the jury on the defendant's motion to suppress.

After conducting an evidentiary hearing, the court issued an oral decision[1] in which it made the following findings: "Detective Wayne Mora is a twenty-two and one-half year veteran of the Manchester police department. He has worked as a detective in that department for approximately ten and one-half years. For twelve years prior to that, he worked as a patrolman. He has received formal instruction in operating under the influence investigations at the municipal police academy and during his initial police training, and in follow up training since he became a police officer. As a police officer, he has, over the years, participated in at least 1000 [operating under the influence] investigations where he conducted field sobriety tests.

"On June 9, 2000, Detective Mora had been working the second shift at the Manchester police department. He went off duty before 1 a.m. and left work. He was driving from Manchester to his home in an unmarked, official Manchester police department vehicle. This automobile was outfitted with flashing wig-wag, colored lights, a siren and a police radio [that] operated on his department's radio frequency. Detective Mora

---

[1] The court subsequently signed a transcript of its ruling, thereby bringing its decision into compliance with Practice Book § 64-1.

was wearing plain clothes at all times on the night in question—or the morning in question.

"Detective Mora was traveling eastbound on Route 44, a public highway in the town of Coventry, Connecticut. As he was doing so, Detective Mora observed a station wagon automobile being driven in the westbound lane of Route 44 in Coventry approaching him . . . just prior to Nevers . . . Road in that town. Detective Mora observed the vehicle come around a curve and drift from the westbound lane in which it had been traveling into the eastbound lane in which Detective Mora was driving. In order to avoid a collision, Detective Mora pulled over to the shoulder of the lane in which he had been driving. The oncoming station wagon was traveling at a high rate of speed per the estimate of Detective Mora. Detective Mora made a U-turn and followed the station wagon westbound on Route 44 in Coventry, Connecticut, for approximately four to five miles. The speed limit on this road was forty-five miles per hour, and Detective Mora testified credibly that the vehicle he was following was exceeding that limit. At one point near the Coventry Funeral Home in Coventry, the defendant's station wagon again drifted from the westbound lane in which it had been traveling and veered into the eastbound lane, nearly hitting another oncoming vehicle. Detective Mora used his two way radio to contact the dispatcher at the Manchester police department. His radio did not have the capacity to directly contact the Coventry police department. Detective Mora notified the Manchester police dispatcher of the situation. He informed the Manchester dispatcher of his direction of travel and asked the dispatcher to contact Coventry police and request that a Coventry officer intercept the station wagon and stop it.

"The detective testified credibly that it was his hope that a Coventry officer might be nearby somewhere

along Route 44 in the area [in which] he and the suspect were driving. Detective Mora continued to follow the station wagon westbound on Route 44. It ultimately traveled along Route 44 westbound from Coventry, Connecticut, into Bolton, Connecticut. The station wagon stopped at a [traffic] light on Route 44 in Bolton, near the Bolton Notch area and then turned left into a shopping plaza there. The station wagon pulled in front of the Bolton Package Store in the plaza. Detective Mora followed the station wagon into the plaza parking lot and positioned his unmarked Manchester police department vehicle behind the defendant's automobile, thereby blocking it. In order to notify the operator that he was a police officer, Detective Mora then turned on the flashing police wig-wag signal lights and his visor flashing light. Again, this was done in order to identify himself to the defendant as a law enforcement officer. Detective Mora radioed the Manchester dispatcher and informed the dispatcher of his location and the location of the suspect's vehicle.

"The Manchester dispatcher thereafter sent several Manchester police cruisers to Bolton to assist Detective Mora. The dispatcher also contacted the Coventry police department dispatcher who, in turn, sent a Coventry officer, Officer [Jeffrey] Spadjinske, to the location where the defendant was being detained in Bolton. Detective Mora testified credibly that he got out of his vehicle and approached the operator, who was the defendant. He asked the operator if he knew why he (Mora) was there. Detective Mora observed that the defendant's eyes were glassy, his speech was slurred and that there was an odor of alcohol on the defendant's breath. The detective testified credibly that he observed full and empty cans of beer in the defendant's vehicle. The defendant told Detective Mora that he was traveling from the University of Connecticut to Rocky Hill. Detective Mora asked the defendant for his license, registra-

tion and insurance card. After some initial delay, the defendant gave those documents to the detective. The defendant told Detective Mora that he hadn't had too much to drink. The defendant said that he had two beers.

"The detective told the defendant 'to sit tight and relax.' He did not question the defendant further. He did not handcuff the defendant or indicate to the defendant that he was under arrest. As noted previously, the defendant's freedom of movement was restricted at that point, and it had been restricted continuously from the point in time that Detective Mora blocked the defendant's vehicle by positioning his police car behind it. Other Manchester police department officers arrived at the scene. They did not interrogate the defendant or assist in the investigation. The court finds from the evidence presented that their presence at the scene was to provide security backup for Detective Mora.

"Officer Spadjinske of the Coventry police department arrived at the scene in Bolton shortly thereafter. Detective Mora spoke with Officer Spadjinske and informed him about the erratic operation in Coventry. Officer Spadjinske subsequently obtained the defendant's license, insurance card and registration document. Officer Spadjinske conducted field sobriety tests of the defendant. He also spoke with the defendant, observed his physical demeanor and saw the beer cans in the defendant's automobile. He, meaning Officer Spadjinske, testified credibly that he smelled alcohol on the defendant's breath. Officer Spadjinske had the defendant perform field sobriety tests in order to determine if the defendant was under the influence of intoxicating liquor, any drug or both. Officer Spadjinske had the defendant perform the heel to toe test, the one-legged stand test and a horizontal gaze nystagmus test. Detective Mora was present when the Coventry officer administered the field sobriety tests to the defendant.

Detective Mora observed the defendant perform the tests, but was not involved in their administration. Detective Mora did not participate in Officer Spadjinske's investigation other than to orally brief Spadjinske on what he (Mora) had observed and to subsequently file a written report on his personal observations for the Coventry police.

"Officer Spadjinske concluded that the defendant failed the field sobriety test. He concluded that the defendant was under the influence of intoxicating liquor, any drug or both. Based on his independent investigation, which included Detective Mora's eyewitness account of the defendant's erratic operation, Officer Spadjinske concluded that there was probable cause to arrest the defendant for operating under the influence of intoxicating liquor, drugs or both on Route 44 in Coventry. He placed the defendant under arrest for operating under the influence and transported him from the scene in Bolton to the Coventry police department headquarters in the town of Coventry, Connecticut."

The court next addressed the issues raised by the defendant's motion to suppress. In his written motion, the defendant challenged Mora's involvement in the arrest. The defendant claimed that the court should suppress any evidence obtained as a result of his arrest because (1) the evidence was the "fruit of an illegal stop by an off duty police officer" in violation of the defendant's state and federal constitutional rights, (2) he had been illegally restrained and detained by an off duty police officer without consent, (3) any statements made to the officer resulted from illegal detainment and (4) any evidence seized as a result of the illegal detainment should be suppressed. During argument on the motion to suppress, the defendant also challenged the legality of his arrest by Spadjinske. The defendant claimed that Spadjinske lacked the statutory authority

to arrest him in Bolton. The state addressed this additional ground raised in support of the motion.

The court addressed both aspects of the defendant's claim. Insofar as the defendant based his motion to suppress on Mora's conduct, the court rejected the defendant's claim. The court concluded that Mora was "functioning as a police officer" when he blocked the defendant's vehicle, requested information from the defendant and instructed him to wait for other law enforcement personnel to arrive. The court, however, concluded that Mora did not arrest the defendant, but that his actions constituted a legally permissible investigatory stop.

The court next addressed the issue of the legality of the defendant's arrest by Spadjinske. The court credited Mora's testimony that he sought assistance from the Coventry police department shortly after he began following the defendant. The court also credited Mora's testimony that he followed the defendant for about four to five miles before the defendant drove into a shopping plaza in Bolton. The court further credited Spadjinske's testimony that he had been dispatched shortly after 1 a.m. to the area of Bolton Notch in response to a report that a driver was operating his vehicle in an erratic manner.

The court also stated: "The court finds that the incidents where the defendant nearly collided with Detective Mora and another vehicle occurred on Route 44 in the town of Coventry. Detective Mora followed the defendant for four to five miles . . . and the court finds that both vehicles were traveling at speeds greater than forty-five miles per hour. Based upon these facts, which the court finds proven by a preponderance of the evidence, the court finds that only a relatively short amount of time elapsed between Mora's initial observa-

tion of the defendant's erratic operation in Coventry and the defendant's turn into the parking lot in Bolton."

The court stated: "The court finds that Officer Spadjinske was acting upon speedy information when he responded from Coventry to Bolton to investigate the allegations that the defendant had been operating under the influence of liquor, any drug, or both, several minutes before on Route 44 in Coventry. Although Officer Spadjinske did not observe the defendant drive his motor vehicle in Coventry or Bolton, he was entitled to rely on the account of the defendant's erratic operation in Coventry that was provided to him by Detective Mora." The court further concluded: "Officer Spadjinske subsequently conducted his own independent observations of the defendant, performed field sobriety tests on the defendant and conducted his own investigation of the allegations against the defendant. The totality of these circumstances led Officer Spadjinske to conclude that the defendant had been operating a motor vehicle under the influence in Coventry several minutes before. The totality of these circumstances led the Coventry officer to place the defendant under arrest for those offenses which allegedly occurred in Coventry."

The court concluded, in light of the facts found, that Spadjinske was authorized to effectuate the defendant's arrest, in Bolton, under either General Statutes § 54-1f (a) or (c). Accordingly, the court denied the defendant's motion to suppress. We hold that Spadjinske was authorized to arrest the defendant under § 54-1f (c) and that the court properly denied the motion to suppress.

The defendant does not challenge the court's decision insofar as it concerned Mora's conduct. The defendant also does not challenge any of the court's factual findings. The defendant's claim is statutory.[2] He claims that

---

[2] During oral argument before this court, the defendant's appellate counsel explicitly abandoned any constitutional challenge to the defendant's arrest.

his arrest violated § 54-1f and that the court, therefore, improperly denied his motion to suppress. When, as here, a defendant challenges the legal conclusions of the court in connection with a motion to suppress, "we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Blackman,* 246 Conn. 547, 553, 716 A.2d 101 (1998).

"The authority to arrest without a warrant is set forth in General Statutes § 54-1f." *State* v. *Kuskowski,* 200 Conn. 82, 85, 510 A.2d 172 (1986). General Statutes § 54-1f (c) provides in relevant part: "Members of any local police department . . . when in immediate pursuit of one who may be arrested under the provisions of this section, are authorized to pursue the offender outside of their respective precincts into any part of the state in order to effect the arrest. Such person may then be returned in the custody of such officer to the precinct in which the offense was committed." According to the terms of that subsection, Spadjinske was authorized to pursue the defendant outside of the territorial jurisdiction of the Coventry police department and to effectuate an arrest in Bolton if (1) the defendant was subject to arrest by Spadjinske under any other provision of § 54-1f and (2) Spadjinske was in "immediate pursuit" of the defendant.

General Statutes § 54-1f (a) provides in relevant part: "Peace officers . . . in their respective precincts, shall arrest, without previous complaint and warrant, any person *for any offense* in their jurisdiction, when the person is taken or apprehended in the act or on the speedy information of others . . . ." (Emphasis added.) The court found that Spadjinske was dispatched at 1:02 a.m. to the Bolton Notch area of Bolton. Mora, an off duty police officer, reported the erratic driving exhibited by the defendant in Coventry, which

he deemed to be an immediate threat to public safety. Mora relayed information to his dispatcher concerning the defendant's location on Route 44, and requested that a Coventry police officer intercept and stop the defendant's vehicle. The court found that Spadjinske responded to the report of illegal activity and arrived at a shopping plaza in Bolton, acting on the "speedy information" relayed to him by Mora. Spadjinske had the right to arrest the defendant, without a warrant, on the basis of information given to him by others concerning an offense committed in his jurisdiction. See General Statutes § 54-1f (a).

"Police officers arrest and charge suspects frequently based on hearsay evidence of victims and witnesses." *State* v. *Czyzewski*, 70 Conn. App. 297, 306, 797 A.2d 643, cert. denied, 261 Conn. 911, 806 A.2d 49 (2002). "Probable cause [to justify an arrest] exists when there are facts and circumstances within the officer's knowledge, and of which he has trustworthy information, sufficient to justify the belief of a reasonable person that an offense has been or is being committed." (Internal quotation marks omitted.) *State* v. *Leary*, 51 Conn. App. 497, 500, 725 A.2d 328 (1999). On the basis of the court's findings, there can be no dispute that had Spadjinske intercepted and stopped the defendant's vehicle in Coventry, he would have possessed the authority under § 54-1f (a) to effectuate a warrantless arrest if he deemed that an arrest was warranted.[3]

We next address the issue of whether Spadjinske was "in immediate pursuit" of the defendant. The defendant

___

[3] Operating a motor vehicle while under the influence of intoxicating liquor in violation of General Statutes § 14-227a is an "offense" for purposes of General Statutes § 54-1f. *State* v. *Harrison*, 228 Conn. 758, 765, 638 A.2d 601 (1994).

Subsection (b) of § 54-1f, which authorizes members of local police departments to effect warrantless *felony* arrests beyond the territorial jurisdiction of their police departments, does not apply to the conduct at issue in this case.

argues that Spadjinske was not in immediate pursuit of the defendant. Relying on *State* v. *Harrison*, 228 Conn. 758, 761–64, 638 A.2d 601 (1994), and *State* v. *Kowal*, 31 Conn. App. 669, 673–74, 626 A.2d 822, cert. denied, 227 Conn. 923, 632 A.2d 702 (1993), the defendant posits that immediate pursuit only occurs when the arresting officer personally witnesses illegal conduct in his or her jurisdiction and follows the offender across one or more jurisdictional boundaries. Here, the defendant argues, Spadjinske neither personally witnessed any illegal behavior in Coventry nor followed the defendant into Bolton to effectuate an arrest.

In *Harrison*, an officer with the Branford police department observed the defendant driving in an erratic manner along public roads in Branford. *State* v. *Harrison*, supra, 228 Conn. 761. The Branford officer followed the defendant for a short distance with the intention of stopping the defendant and conducting an investigation. Id. The defendant was driving along a curve, and the officer decided to wait and to stop the defendant's vehicle once it had reached a driveway. Id. By the time that the officer stopped the vehicle, it had crossed into East Haven. Id. The officer conducted an investigation and arrested the defendant in East Haven. Id. The defendant was convicted by a jury of operating a motor vehicle while under the influence of intoxicating liquor. Id., 759. On appeal to this court, the defendant claimed, inter alia, "that his arrest in East Haven by a Branford police officer violated General Statutes § 54-1f." *State* v. *Harrison*, supra, 759. Specifically, the defendant argued that § 54-1f did not authorize the Branford officer to pursue him outside of Branford because operating a motor vehicle while under the influence of intoxicating liquor was not an "offense" within the meaning of § 54-1f. Id., 761–62. This court affirmed the conviction, concluding that operating under the influence was an "offense" within the meaning of § 54-

1f. *State* v. *Harrison*, 30 Conn. App. 108, 618 A.2d 1381 (1993), aff'd, 228 Conn. 758, 638 A.2d 601 (1994).

Our Supreme Court granted certification to appeal limited to the following issue: "Whether General Statutes § 14-227a is an 'offense' within the meaning of General Statutes § 54-1f, thus permitting an officer to pursue an offender outside his jurisdiction in order to make a stop at the first safe opportunity?" *State* v. *Harrison*, 225 Conn. 921, 625 A.2d 824 (1993). Considering the functions and purposes of § 54-1f, among other considerations, the court concluded that motor vehicle violations were "offenses" for purposes of the statute. *State* v. *Harrison*, supra, 228 Conn. 765. In reaching this holding, the court stated that "Connecticut's statutory scheme reflects an unambiguous policy aimed at ensuring that our highways are safe from the carnage associated with drunken drivers." (Internal quotation marks omitted.) Id. The court reasoned that adoption of the statutory construction urged by the defendant would permit drivers to frustrate this policy by their "fortuitous crossing of a town line." Id. The court held that because the Branford officer could have arrested the defendant in Branford under § 54-1f (a) and because the officer had pursued the defendant into East Haven, the officer was authorized, under § 54-1f (c), to arrest the defendant in East Haven. Id.

In *Kowal*, two officers with the Derby police department observed the defendant driving in an erratic manner along public roads in Derby. *State* v. *Kowal*, supra, 31 Conn. App. 671. The Derby officers followed the defendant for a short distance into neighboring Shelton. Id. The officers initiated a stop of the defendant's vehicle in Shelton, conducted an investigation incident to their stop and arrested the defendant. Id. The trial court in *Kowal* denied the defendant's motion to suppress the evidence obtained during his arrest. Id. The defendant based his motion, in part, on his claim that his arrest

by Derby police in Shelton was not authorized under § 54-1f (c) because the facts did not support a finding that there had been an " 'immediate pursuit.' " Id. The court denied the motion to suppress, and the defendant's conviction, after a conditional plea of nolo contendere, followed. Id., 670–71. This court affirmed the trial court's application of § 54-1f (c), in which the trial court asked whether the Derby police had followed the defendant " 'without delay.' " Id., 673.

We disagree with the defendant that *Harrison* and *Kowal* stand for the proposition that there can only be an "immediate pursuit" for purposes of § 54-1f (c) when there are findings that the arresting officer personally observed illegal conduct and then followed the suspect across jurisdictional boundaries. Although in both *Harrison* and *Kowal* the arresting officers witnessed illegal activity and were within eyesight of and, presumably, only a short distance behind the defendants as they pursued them across town lines, these findings were not critical to the holdings that a pursuit, for purposes of § 54-1f (c), had occurred. To the contrary, this court in *Kowal* endorsed a broader interpretation of "immediate pursuit" than does the defendant. The court stated: "In interpreting the term 'immediate pursuit' as found in § 54-1f (c), the trial court applied its ordinary meaning of 'to follow without delay' and found that the officers were in 'immediate pursuit' of the defendant for purposes of the statute. We agree. We are unpersuaded by the defendant's contention that the term 'immediate pursuit' in § 54-1f (c) should derive its definition from General Statutes § 14-283a (a), which concerns high speed chases. The defendant's alternate claim that the common-law doctrine of 'hot pursuit' should control the definition of 'immediate pursuit' and require either an attempted avoidance of an arrest or an awareness of a pursuit is also without merit. Police officers need not have lights flashing or sirens on to be in immediate

pursuit; it suffices if the pursuit is conducted without undue delay and is accomplished at the earliest safe opportunity. No chase is required for 'immediate pursuit.' " *State* v. *Kowal*, supra, 31 Conn. App. 673–74.

In the present case, the court concluded that an immediate pursuit by Spadjinske had preceded the arrest. This conclusion is supported by the facts found. The court found that the relevant events, beginning with Mora's first encounter with the defendant's erratic driving and culminating in Mora's encounter with the defendant in the shopping plaza in Bolton, had occurred during "a relatively short amount of time . . . ." From our review of the court's findings, it appears that these events occurred during the course of several minutes. Mora left work shortly before 1 a.m., began driving home along Route 44 and encountered the defendant shortly thereafter. Mora followed the defendant eastbound on Route 44 at speeds in excess of the forty-five mile per hour posted speed limit. Mora contacted his police dispatcher "shortly after he began following the defendant" and followed the defendant for only four to five miles before the defendant reached the shopping plaza. Spadjinske was dispatched by 1:02 a.m. Mora detained the defendant only "briefly" until, on the basis of Mora's second radio transmission, Spadjinske arrived in the shopping plaza in Bolton.

The court found that the Coventry police department immediately dispatched Spadjinske to the defendant's location for the purpose of intercepting and stopping the defendant. Spadjinske pursued the defendant not on the basis of his own personal observations of the defendant, but on speedy information relayed to him as a result of Mora's radio transmissions. The court's factual findings with regard to the timing of the events support a conclusion that Spadjinske pursued the defendant with the requisite degree of immediacy discussed in *Kowal*. He investigated the defendant's conduct and

arrested the defendant at the shopping plaza in Bolton, at the earliest opportunity that he could do so. The court's findings reveal absolutely no delay on Spadjinske's part in responding to the defendant's location.

Accordingly, we conclude that the defendant's arrest was authorized by § 54-1f (c). Spadjinske properly pursued the defendant into Bolton so as to effectuate a warrantless arrest for an offense that occurred in Coventry. The court properly denied the motion to suppress.

The judgment is affirmed.

In this opinion the other judges concurred.